UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| Fuller's Service Center, Inc., | ) | Case No. 25-1345 |
| | ) | |
| Debtor. | ) | Honorable Deborah L. Thorne |

## **MEMORANDUM OPINION**

Fuller's Service Center, Inc. (FSC or Debtor) operates a car wash and auto repair business in Hinsdale, Illinois.  The Fuller Family has operated FSC and other related entities for many years. The shareholders of FSC include six siblings who are also shareholders in Fuller's Home and Hardware (FH&H) and are either shareholders or members of the other related entities.[1]  Douglas Fuller is the president of FSC and president of the related entities.

Although Douglas Fuller is the president of all the Fuller Entities, he receives his salary only from FSC and does not work for the other entities. Transcript of Record at 328, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).  Susan Groenewold also works only for FSC and receives her salary only from FSC. *Id*.  Paula and Colin Fuller run FH&H and Fuller's Landscaping. *Id*. at 336.  Of the sixty-five employees at FSC, Mr. Fuller testified that six of them are family members, including Owen Fuller and Gretchen Groenewold. *Id.* at 334.[2]  While each of the companies are separate entities, loans are freely made between related entities when needed.

---

[1] The shareholders of FSC are Mr. Fuller's siblings and include Paula Fuller, Susan Groenewald, Adam Fuller, Ethan Fuller, and Colin Fuller.  In addition to FSC, the Fuller siblings are also shareholders in Fuller's Home and Hardware (FH&H) as well as other entities, collectively, the Fuller Entities, including Fuller's Administration, Fuller's Landscaping, Fuller's of Naperville (a car wash), Fuller's of Cicero (a real estate company), Douglas Fuller Family Limited Partnership, 102 W. Chicago, LLC, 101 & 109 W. Chicago, LLC, and Munn Holdings, LLC.

[2] Later testimony revealed that John Veselik, Mr. Fuller's son-in-law, Grace, his niece, Aaron and Aiden Fuller, his sons, Preston Whitmer, his cousin, Doug Groenewold, his nephew, Emma Fuller, Anne Fuller, Caleb Wilkinson, a cousin, Isabelle Fuller, Gretchen Fuller, his wife, and Colin Fuller, Jr., a nephew, have all worked for FSC in the last two years. Transcript of Record at 389-94, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).

Transcript of Record at 334-35, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246). More frequently than not, the loans are not repaid, although the pre-petition books, records, and tax returns reflect many of the loans. FSC and its related entities appear to have been profitable, supporting several family members and their over sixty-five employees.

On June 20, 2023 a tragic accident occurred when Sean Patrick Richards was killed by a car driven by an FSC employee exiting the car wash. Sean Richard's parents, as the Richards Family Representatives, filed a wrongful death claim which is pending in the Circuit Court of Cook County.[3]

In January 2025, FSC filed a voluntary chapter 11 petition in this court. In the months after the accident and prior to the chapter 11 filing, FSC and its related entities and shareholders pondered how to preserve their traditions, monetary value, and cash flow in light of the enormous claim held by the Richards Family. Much of the testimony described below illustrates the indecision, the plotting, and discussions between the bookkeeper, Susan Headley, attorneys for FSC, its outside accountant, Michael Phillips, and the Debtor's principals prior to filing and thereafter, often in response to inquiries from the Office of the United States Trustee (UST) and the Richards Family.

This matter is now before the court on the Motions of the United States Trustee and the Richards Family Representatives[4] to Dismiss or Convert, or in the Alternative for the Appointment

---

[3] Prior to the bar date, the Richards Family filed a proof of claim for $500,000,000, and the automatic stay has been modified to allow the wrongful death lawsuit to proceed to determine the liability beyond that of insurance.

[4] The Richards Family Representatives are Brian and Kristine Richards in their capacity as Independent Administrators of the Estate of Sean Patrick Richards, deceased.

of a Chapter 11 Trustee for the chapter 11 estate of Fuller's Service Center, Inc.  The motions have been fully briefed, a contested hearing took place over several days, and the parties had extensive time for oral arguments.  The matter was taken under advisement and is now ripe for ruling.  As discussed below, the Motion to Appoint a Chapter 11 Trustee is granted.  The Office of the United States Trustee is directed to appoint a Chapter 11 Trustee.

## I.

### Section 1104 of the Bankruptcy Code Mandates the Appointment of a Chapter 11 Trustee For Cause

The appointment of a chapter 11 trustee is governed by section 1104 of the Bankruptcy Code which provides that "[a]t any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court *shall* order the appointment of a trustee." 11 U.S.C. 1104(a) (emphasis added).  Section 1104(a) lists several conditions which trigger an appointment: "(1) for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause. . ." and "(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 US.C. 1104(a)(1) and (2).

Section (a)(1) mandates the appointment of a trustee when the bankruptcy court finds cause. *In re Sharon Steel Corp,* 871 F.2d 1217, 1226 (3rd Cir. 1989); *In re Spiegel*, 662 B.R. 666, 683 (Bankr. N.D. Ill. 2024).  Section (a)(2) provides a more flexible standard, but both sections leave the determination of whether cause exists to the discretion of the court. *In re Sharon Steel Corp,* 871 F.2d at 1226; *In re Woodlawn Comm. Dev. Corp.,* 613 B.R. 671, 684 (N.D. Ill. 2020).

In examining the evidence, the court must use its discretion to determine whether the evidence provided is sufficient to appoint a chapter 11 trustee.  Factors courts consider in appointing a trustee include "(1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for rehabilitation; (3) whether the business community and creditors of the estate have confidence in the debtor; and (4) whether the benfits outweigh the costs." *In re LHC, LLC,* 497 B.R. 281, 293 (Bankr. N.D. Ill. 2013).

Further, section 1104(e) states,

> The United States trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or members of the governing body who selected the debtor's chief executive or chief financial officer participated in actual fraud, dishonesty or criminal conduct in the management of the debtor or the debtor's pubic financial reporting.

11 U.S.C.  1104(e).   In this case, both the largest creditor, the Richards Family, and the Office of the United States Trustee have moved for the appointment of a chapter 11 trustee.  Although there appears to be a question among courts outside this district as to the correct standard of proof to apply under section 1104, the courts in this jurisdiction have applied the "clear and convincing" standard to justify the appointment of a chapter 11 trustee.  *In re LHC, LLC,* 497 B.R. at 291; *In re Speigel*, 662 B.R. at 683.  Accordingly, this court will apply the clear and convincing standard.

After three days of testimony, substantive closing arguments, a review of the evidence presented and the law, this court finds that the United States Trustee and the Richards Family proved through clear and convincing evidence that the appointment of a trustee is mandated.

## II.

## Evidence Presented

### A. Financial Management Stucture

Douglas Fuller is the president of the Debtor and all affiliated entities. Transcript of Record at 397, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).  He has been the president of FSC for approximately thirty-one years and has worked at FSC for roughly forty years. *Id.* at 321-22.  As president, Mr. Fuller is responsible for the everyday management of FSC, which includes ensuring that the shop is open, working with mechanics, checking in with managers, and establishing work needs for the day. *Id.* at 322.  Mr. Fuller appears competent concerning the operation of the car wash and service center, but he admitted that he is unfamiliar with the financial side of the business and has hired people to work in that area. *Id.* at 325.  Indeed, his testimony concerning financial structure was less than credible and demonstrated that he has deligated many of the financial decisions to others.

FSC employes Susan Headley as its controller, and she was primarily responsible for preparing the schedules and statement of financial affairs as well as the monthly operating reports.  Each of these documents were signed by Mr. Fuller under penalty of perjury as the responsible party for FSC. (UST's Ex. 35 at Dkt. 193).  When asked if he had ever seen the bankruptcy documents, Mr. Fuller stated that he had "never read it before." Transcript of Record at 217, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).  Despite being the president of the Debtor and its affiliates and the responsible party, Mr. Fuller admitted to having very little involvement in preparing the schedules of assets, lists of creditors, and other documents for the bankruptcy filing. *Id.* at 221.  He did not appear to be at all conversant with the financial operations

5

of the Fuller Entities but testified that he had no intention of selling any of the Fuller Entities to pay FSC's debts or relinquishing any amount of control of the Fuller Entities.

As explained below, FSC and its related entities loaned each other money and paid for many expenses incurred by family members.  These loans and "due from shareholders" line items were carried on the books of FSC and its related entities for years, but just prior to the chapter 11 filing, these assets were removed from the books and records.  Although serving as the responsible party and the president of FSC, Mr Fuller testified that he knew nothing about and had nothing to do with the removal of the intercompany loans and due from shareholders, admitting that he "was just trusting my accountant and our controller that was doing the paperwork, and I was signing and skimming over." *Id*. at 228.

FSC's accountant is Michael Phillips of AXK. Mr. Phillips works closely with Carolin Thalmann, a manager at AXK, and with Mrs. Headley.  When asked why the intercompany loans and due from shareholders were not included in FSC's first amended schedules, Mr. Fuller said that Mrs. Headley misunderstood "the ask, which I had nothing to do with." *Id*. at 232.  He admitted that financial reporting was left to Mrs. Headley, Mr. Philips, and Ms. Thalmann, and he often signed documents on their advice without thoroughly understanding them.

### i.      Policies.

Mrs. Headley testified that FSC has a number of "policies," most of which were not in writing and are more likely tradition.  Among these unwritten policies are those regarding purchasing Christmas trees for key employees and family members, buying luxury cars for key employees and family members, paying shareholder compensation, and paying for shareholders' and employees' personal expenses on FSC credit cards. Transcript of Record at 599-600, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).  Mrs. Headley stated that although there

is no written policy, "it's been in effect for many years, and it's the same policy now that it always was." *Id*. at 600. In reality, Mrs. Headley testified that if she needs to know a policy or clarify it, she must ask Doug Fuller and Susan Groenewold. *Id*. at 601. When Mrs. Headley was asked how she would enforce these policies, for example, if her boss, Mr. Fuller, said he wanted to pay himself more money or change the credit card policy or vehicle policy, Mrs. Headley said, "I would object and I would say no." *Id*. at 634-36. It was not clear what would happen if Mrs. Headley and Douglas Fuller or Susan Groenewold did not agree on a specific "policy."[5]

### ii.    Due From Shareholders.

Over the years, the Debtor and its affiliate companies have loaned money to each other without repaying those loans. In an email to Mrs. Headley, Mr. Phillips described these intercompany loans as "robbing Peter to pay Paul." The loans allow a closely held company "with 100% common ownership" to assist "one entity . . . to operate." (UST's Ex. 29 at. Dkt. 193). For example, "If Naperville was short on cash, then some of the other entities would have to make up that shortfall." Transcript of Record at 125, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245). The Debtor's six shareholders also received money from the Debtor marked on the Debtor's financial statements as "due from shareholders." The "due from shareholders" was in large part the result of personal expenses charged on FSC credit cards and computed on a monthly basis by Mrs. Headley.

---

[5] The Richards' counsel questioned if Mrs. Headley could actually deny a request from Mr. Fuller by asking, "But if you had a specific direction and you disobeyed, the possibility is that you could be fired?" *Id*. at 639. Mrs. Headley agreed that being fired was a possibility for disobeying a directive from Mr. Fuller.

The Debtor's combined financial statement for 2023 listed a "due from related parties" totaling $3,220,698 (Richards Ex. 3 at Dkt. 197).  On the eve of filing its petition, however, the Debtor removed both the intercompany loans and the due from shareholders from its financial statements.  The Balance Sheet dated November 30, 2024 had a due from shareholders totaling $1,720,616. (UST's Ex. 11 at Dkt. 192).  Mr. Phillips confirmed that both "were removed at the end of 2024." Transcript of Record at 49, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).  There was no evidence that these amounts were repaid by the shareholders and the on again off again amounts continued to flucuate.

Throughout the first six months of the FSC chapter 11 case, there was much confusion and fumbling as to whether the due from shareholder amounts should be on or off the balance sheets.  As a result, these amounts were on and then off and then back on again.  There was apparently no good solution because if they were removed and listed as distributions to the individual shareholders, shareholders would owe income tax, but if they remained on the Balance Sheet, FSC had every right to collect from the shareholders.  FSC and Mr. Fuller demonstrated the indecision and desire to cheat either the IRS (if the loans were never to be repaid) or its creditors (if this valuable asset was not liquidated for their benefit).

For example, the Debtor's Balance Sheet dated December 31, 2024 showed a due from shareholders totaling $586,303 (UST's Ex. 12 at Dkt. 192).  Later, Mrs. Headley admitted to removing the intercompany loans and due from shareholders items following the Creditors' Meeting.  Mrs. Headley used a Journal Entry to remove the intercompany loans and due from shareholders on February 21, 2025 and on April 30, 2025. (UST's Ex. 33 and 34 at Dkt. 193).  A note attached to the Journal Entry states, "From Susan: attorney advised to eliminate all inter-company due to/from shareholders for Chapter 11 filing." *Id*.  Mrs. Headley believes that note was

8

made by Ms. Thalmann. Transcript of Record at 132, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).

Because of pressure from the UST, the Debtor eventually put the intercompany loans and due from shareholders back on the Balance Sheet.  Email exchanges on March 20, 2025 between Mrs. Headley and Mr. Phillips showed that the Debtor struggled to explain why the loans were removed to begin with. (UST's Ex. 29 at Dkt. 193).  One week before this trial began, the Debtor filed amended schedules, disclosing items removed from the Balance Sheet (Dkt. 219), which were not included in the previous schedules. (*See* Dkt. 32 and Dkt, 57).  At the trial, Mr. Phillips explained that the items were removed to show a cash flow forecast. Transcript of Record at 50, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).  Mrs. Headley further clarified that she removed the items because she believed that the Debtor had to show only assets that generated cash flow. Transcript of Record at 49, 127, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).[6]  Additionally, Mrs. Headley included items on the schedules even though she was not sure they would generate cash flow.  (UST's Ex. 3 at Dkt 191); *see also* Transcript of Record at 630-32, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).

Further, the Debtor's 2024 tax return showed that due from shareholders totaled $2,144,730 at the beginning of the year and $2,156,456 at the end of the year, a $12,000 increase. (UST's Ex. 44 at Dkt. 226).[7]  This is different from the Debtor's transaction ledger, which shows $1,782,871

---

[6] This is not what the schedules instruct a debtor to do.  Schedule A/B explicitly asks debtors to "disclose all property . . . which the debtor owns or in which the debtor has any other legal, equitable, or future interest."

[7] A component of the due from shareholders was credit card charges and other expenses incurred by the shareholders, which totaled $50,000 from September 2023 to February 2025. Transcript of Record at 262-63, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).  Members of the Fuller Family used the company credit for personal expenses without paying back the charges.  The Debtor opened an American Express credit card account post-petition, and several of the Debtor's employees have a credit card tied to that account.  The account was used for

due to shareholders. (UST's Ex. 15 at Dkt. 192).  There was confusion and conflicting testimony

that was simply not credible as Mrs. Headley and Douglas Fuller struggled to explain that the

difference was created by the note to Susan Groenewold, and aside from that, loans to shareholders

increased by $12,000 in 2024. Transcript of Record at 142, *In Re Fuller's Service Center, Inc.*, 25-

01345 (2025) (Dkt. 245).  The transaction ledger shows multiple entires for life insurance totaling

more than $12,000 and when asked about this discrepancy, Mrs. Headley said she did not know

why the tax return does not show more than a $12,000 increase. *Id*.[8]

---

alcohol purchases that Mrs. Headley claimed were business charges for meetings after work but could not be sure whether the purchases were business or personal expenses.  Another large expense was to Susan Groenewold for a $9,258 plane ticket to Guam. (UST's Ex. 15 at Dkt. 192).  Mrs. Groenewold was "reimbursed for when Doug's son was critically ill in Guam, and Doug had to fly out to be with him." Transcript of Record at 138, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).  The Debtor reimbursed Mrs. Groenewold, and Mrs. Headley "recorded it as a due from shareholder for Doug." Transcript of Record at 549, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).

At trial, Mrs. Headley stated that she relies on the employees with access to the account to report to her whether the purchases were personal expenses or business related.  If the employee admits the purchase was personal, then the amount would be taken out of their paycheck or classified as due from shareholders.  If the employee tells Mrs. Headley it was a business purchase, then the amount would be expensed.  Mrs. Headley said it is for the shareholders to decide whether the expense should be repaid. Transcript of Record at 147, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).  Mrs. Headley said she has both taken personal expenses out of the user's paycheck and added them to the due from shareholders. (Richards Ex. 122 at Dkt. 222).  Mrs. Headley later testified that credit card use by FSC employees with access "would have been recorded as due from shareholders," but that policy changed "three years ago."  Transcript of Record at 547, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).  Now, Mrs. Headley claims that "[i]f there was a personal charge on any of their cards, I would have taken it out of their paychecks." *Id*.  The Debtor's original schedules show that the shareholders were consistently paid $5,293 for each pay period in 2024. (Richards' Ex. 16 at Dkt. 197).  These amounts never decreased.  Mrs. Headley tried to explain that this was because they were "the gross amounts." Transcript of Record at 605, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).  But the schedule explicitly notes that these amounts were paid by check to the shareholders listed.  Mrs. Headley explained that "that's how the journal entry is recorded . . . [and] the net amounts should have been on the schedules." *Id*.  No evidence was provided showing net amounts paid to employees after deducting the credit card charges, if those expenses were actually deducted from the gross amount.

[8] Apparently FSC and the shareholders converted term life insurance to whole life insurance some time before the accident and this was one more way that FSC removed cash into an asset that benefited the shareholders. Transcript of Record at 371, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).

### iii.  Intercompay Loans

The Debtor's Balance Sheet from November 2024 listed total intercompany loans at $2,430,043, but these were completely removed from the December 2024 Balance Sheet. (UST Ex. 11 at Dkt. 191).[9]  In an email to Ms. Thalmann on April 30, 2025, Mrs. Headley stated that she needed "to remove the intercompany loans from the 2024 balance sheet" because "Dave Welch doesn't want to have any loans on the books from shareholders." (UST's Ex. 32 at Dkt. 193).  She later told Ms. Thalmann in an email that the intercompany loans would have to be removed "since those weren't shown on the initial Chapter 11 filing." *Id*.  At trial, Mrs. Headley explained that the email she sent to Ms. Thalmann on April 30, 2025 was because she made "a mistake" and "did not understand [Mr. Welch's] ask." Transcript of Record at 130, *In Re Fuller's Service Center*, Inc., 25-01345 (2025) (Dkt. 245).

On July 22, 2025, the Debtor filed a Disclosure Statement as it prepared to propose a plan of reorganization.  The Disclosure Statement included an amended Balance Sheet for December 2024 in which FSC reinstated the intercompany loans which totaled $2,292,729.  The due from shareholders remained the same at $598,029.  Curiously, the Debtor's Third Amended Schedules filed on September 18, 2025 listed $1,558,426 due from shareholders, and the intercompany loans totaled $2,292,728. (Dkt. 219).  Mr. Fuller explained that the loans were removed because Mrs. Headley told him the loans had no cash value, so when he told her to "clean it up," she thought

---

[9] The Debtor's 2022 tax return showed the intercompany loans totaled $1,379,549 at the beginning of the year and $2,754,911 at the end of the year. (UST's Ex. 9 at Dkt. 191).  Mrs. Headley explained that the increase "would have been the 1.3 million from 102 West Chicago." Transcript of Record at 118, *In re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).  The Debtor's 2023 tax return shows loans to shareholders totaling $2,025,000 at the beginning of the year and $2,144,730 at the end of the year. (UST's Ex. 10 at Dkt. 191).  Mrs. Headley said that "the life insurance premimums make the bulk of [the increase]." Transcript of Record at 119, *In re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).

that meant to remove them from the Balance Sheet. Transcript of Record at 240-41, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).  At his June 4, 2025 deposition, Mr. Fuller testified that the loans were removed in connection with the sale of car washes for tax purposes. *Id*. at 241.

Emails between Mrs. Headley and Mr. Phillips show that they were most concerned with the tax implications of reclassifying the intercompany loans and due from shareholders on the Balance Sheet.  Transcript of Record at 160, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).  Specifically, in an email to Mr. Phillips on January 10, 2025, Mrs. Headley sought to "satisfy the Chapter 11 Balance Sheet requirements now and be able to report the adjustment to equity differently on the tax return." (UST's Ex. 27 at Dkt. 193).

Up until September of 2025, the month the trial began, Mr. Phillips and FSC continued to discuss how to treat the due from shareholders and the intercompany loans. *Id*. at 497-98.  But by the time the Debtor's taxes were filed on September 15, 2025, Mr. Phillips "knew that they put the loans to shareholder and intercompany loans back on the balance sheet." *Id*. at 500.  He further explained that if the due from shareholders were treated as distributions on the 2024 taxes, then the Balance Sheet and the tax return would be inconsistent. *Id*. at 500.

One more piece among all the messy transactions was the sale of Fuller's Calumet City to Sparkle Car Wash in 2024.  At the time of the sale, Calumet City owed FSC $32,000 and this amount was never repaid to FSC "because the entity was sold, and it was recorded as distributions." *Id*. at 571.  FSC owed other entities that were sold $2.6 million, but this debt "was eliminated" after the sale. *Id*.  Mrs. Headley explained that "on the debtor's books, it would have been a liability due to those other entities, and then that was eliminated as additional . . . capital contributions on the debtor's side to eliminate debt." Transcript of Record at 591, *In Re Fuller's Service Center,*

*Inc.*, 25-01345 (2025) (Dkt. 248).  However, on the FSC Combined Financial Statements for 2023, FSC was owed $4,633,905. (Richards' Ex. 3 at Dkt. 197).  Mrs. Headley appeared unclear about what exactly created this amount due to FSC but testified that she "believe[d] the $4.6 is made up of the due from shareholders, the Groenewold note, and due from Fuller's Admin Naperville, and 102 West Chicago." Transcript of Record at 595, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).  With the elimination of the $2.2 million FSC owed plus the $4.6 million other entities owed to FSC, there should have been a net figure of $6.8 million reflected somewhere in the Debtor's records. *Id.*  But it was not reflected.  Mrs. Headley stated that the monthly operating reports initially reflected intercompany loans and due from shareholders amounting to $6.8 million, then backtracked and said they did not. *Id.* at 596.  She clairifed that "you need to look at on the liability side the due to related parties, the $2.827" and that "the difference in those numbers is the due from shareholders, the Groenewold note, and whatever, Fuller's Home & Hardware, Fuller's Naperville, and 102 West Chicago." *Id.*  In sum, her testimony demonstrated confusion, perhaps the result of conflicting orders, but in the end, her testimony was less than credible.

   iv.    **Cars for Non-Employees**

   FSC has an unwritten policy allowing it to purchase luxury cars for key employees and members of the Fuller Family who work at FSC.  In spite of this unwritten policy, FSC is paying for a number of cars for non-employees.

   (a) Colin Fuller drives a 2023 Chevy Silverado, paid for by the Debtor, despite working for FH&H and Fuller's Landscaping. Transcript of Record at 268, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).  In his application for the car loan, Colin said he worked for FSC as the vice president. (Richards' Ex. 6 at Dkt. 197).  Mr. Fuller said he did not know whether Colin was the vice president of the Debtor or any other

13

affiliates. Transcript of Record at 275, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).  In fact, Colin is not the vice president of FSC and is not even an employee of FSC. *Id*. at 271.  Mr. Fuller said he did not "think [Colin] did anything wrong" when he falsely claimed he was an employee of the Debtor to obtain a car loan at the Debtor's expense. *Id*. at 274.

(b) Sara Fuller, who is employed by FH&H, drives a 2022 Mercedes. The Debtor purchased the Mercedes for Mrs. Groenewold, but it was given to Sara because "Susie wanted a different car." Transcript of Record at 554-55, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).  Mrs. Headley said that FH&H has been making the payments on the 2022 Mercedes since January of 2024. *Id*. at 555.

(c) The Debtor also purchased a 2024 Audi for Paula Fuller, paid off the loan, re-titled the car to FH&H in January of 2025, and FH&H took out another loan for the Audi from Heartland Bank. *Id*. at 556-58.

(d) Luke Goss, Mr. Fuller's nephew, works for FH&H and drives a 2022 Cadillac Escalade. *Id*. at 558-59.  Luke apparently got the Cadillac while working for FSC.  He then moved to FH&H while the car was still titled to FSC. *Id*.  Mrs. Headley claims that FH&H owes FSC a year's worth of payments for the Cadillac recorded as a "due to/from entry." *Id*. at 559-60.

(e) FSC purchased a car for Elizabeth Fuller who is neither a shareholder nor an employee, and this is not accounted for anywhere in the Debtor's schedules. Transcript of Record at 609, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).

(f) Finally, post-petition, the Debtor transferred title to two vehicles to FH&H on March 13, 2025 but never received any consideration. Transcript of Record at 163-65, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).[10]

### v.   Other Loans To and From Related Entities

#### a.   Snowplows

On January 1, 2025, the Debtor signed a Truck, Trailer, and Equipment Lease with FH&H in which the Debtor leased its snowplow equipment to FH&H for $10,000 per month. (Debtor's Ex. 27 at Dkt. 194).  The amount paid was determined by Mrs. Headley, not Mr. Fuller. Transcript of Record at 402, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).  For a number of years, FSC and FH&H operated competing snowplow businesses for different customers. Transcript of Record at 379, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).  Mr. Fuller testified that FSC made a "business decision" to cease its snowplow business because following the accident, its "insurance company's rates were too high if we continued to do plowing." *Id*.

Mr. Fuller also testified that the plows do not have any independent value because the plows will not attach to another truck or vehicle. *Id*. at 381, 401, 403.  The plows must be attached to the exact make and model vehicle or they will not work and have a $200 to $500 value if taken off the truck. *Id*.  On the Debtor's original schedules, FSC listed plows worth $5,941, $4,000,

---

[10] Additionally, in the Debtor's Amended Disclosure Statement, Class 4 to Class 18 all relate to financing on vehicles.  Class 16 is for Luke's Cadillac.  In the plan, the Debtor contemplated financing a car that is no longer being used in its business operations. (Richards' Ex. 31 at Dkt. 197).  The Escalade was removed in the Amended Plan, and Mr. Fuller testified that "[Mrs. Headley] made a mistake there." Transcript of Record at 305, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).

$4,352, $2,177, $4,413, $5,408, $4,319, $528, $1,050, $1,357, $1,477, $5,093, and $2,306. (Richards' Ex. 16 at Dkt. 197). None of these plows are listed on the Truck, Trailer, and Equipment Lease. (Debtor's Ex. 27 at Dkt. 194); *see also* Transcript of Record at 407, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246); *and* Transcript of Record at 193-94, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).

### b. Christmas Trees

On October 16, 2024, FSC bought Christmas trees totaling $50,000. (Richards' Ex. 21 at Dkt. 197). The trees were purchased for FH&H to sell. Transcript of Record at 169, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245). Mrs. Headley initially testified that FH&H repaid FSC in early 2025. *Id*. at 170. Mrs. Headley could not identify where that debt would be reflected, but if it was, the intercompany loan balance would have fluctuated by $50,000. *Id*. at 171. She later admitted that FH&H did not repay FSC for the trees FSC purchased in 2024. FSC has never sold Christmas trees but has loaned money to FH&H to buy the trees to later sell. Transcript of Record at 561, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248). In 2024, the Debtor bought thirty-eight Christmas trees "for family members." Transcript of Record at 266, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246). Mrs. Headley later said that FSC buys trees "for key employees and family members." Transcript of Record at 562, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248). The Debtor said it will not be purchasing Christmas trees for family members and key employees this year.

### B. Loan to Susan Groenewold

Sometime in 2022, the Debtor loaned Susan Groenewold $571,000, which was memorialized in an incomplete promissory note. (Debtor's Ex. 31 at Dkt. 194). Mr. Fuller testified that the loan will be repaid to the Debtor from his mother's $4 million life insurance policy once

16

she passes away. Transcript of Record at 366, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025)

(Dkt. 246). The proceeds of that policy will be divided equally among the seven siblings, one of

whom is not a shareholder in the business, which amounts to $571,000 per person. *Id*. Under the

promissory note, Mrs. Groenewold is supposed to pay two percent interest on her loan. The exact

amount owed is not memorialized anywhere. Mr. Fuller admitted that he does not know exactly

how much Mrs. Groenewold owes, and he would "have to figure it out when my mom dies."

Transcript of Record at 419, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246). Mr.

Fuller also testified that there is a signed copy of the Groenewold promissory note but did not

know where it was located. *Id.* at 420.

### C. Loan to Elizabeth Fuller

One of the items included in the due from shareholders is a $187,000 note to Elizabeth

Fuller, the mother of the six shareholders, paid directly from the Debtor's account. Importantly,

Elizabeth is not a shareholder, but her note was still classified as due from shareholders. Mrs.

Headley stated that the $187,000 was memoralized in a note payable for "[m]oney that she would

have received throughout the years . . . [for] personal expenses." Transcript of Record at 124, *In

Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245). In emails between Mrs. Headley and

Mr. Phillips, Mrs. Headley states that the loan to Elizabeth is supposed to be repaid from

Elizabeth's "life insurance proceeds after she dies, highly doubt that will happen." (UST Ex. 25 at

Dkt. 192). Despite these emails, Mr. Fuller testified that it is his "intent" to collect on the loan

from his mother, along with the other shareholder debts. Transcript of Record at 382, *In Re Fuller's

Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).

17

**D. Life Insurance**.

Fuller's Administration is an entity owned by the six shareholders but does not generate revenue. Instead, it issues payroll for the six shareholders and collects and pays the six shareholders' insurance premiums. It was formed in 2017 "to facilitate a buy/sell agreement that was set up for the six shareholders" where "each entity, depending on where the shareholder worked, would fund . . . life insurance . . . to Fuller's Admin," which would "pay the monthly premiums for all six shareholders." Transcript of Record at 136, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245). Those life insurance policies have been in place since 2017, but in 2023, shortly after the accident, the policies were converted from term life insurance policies to whole life insurance policies. Transcript of Record at 371, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).

Mr. Fuller testified that the policies were converted because Mrs. Groenewold had cancer, and the "[s]ix of us would not have good rates or not even insured, unless we switched over to whole life insurance." *Id*. at 372. The cost of the policies is $8,000 total per month paid by FSC and FH&H. *Id*. The $8,000 whole life insurance policies cost FSC roughly five times as much as the term life insurance policies. Transcript of Record at 173-74, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).[11] FSC and FH&H pay for the whole life policies which further depletes FSC's cash for the benefit of the Fuller Family member shareholders.

---

[11] FSC pays for Mr. Fuller's and Mrs. Groenewold's premiums, FH&H pays the premiums for Colin and Paula Fuller, and FSC also pays for Adam and Ethan Fuller's premiums despite neither of them working for the Debtor. *Id*. at 375; *see also* Transcript of Record at 565, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).

Mrs. Headley testified that she made another mistake in recording the life insurance premiums "because when the transfers were made from the debtor to Fuller's Admin . . . I didn't record those as expenses.  I recorded them as due from shareholders. But on the Fuller's Admin side, those transfers got picked up as income on their financials." Transcript of Record at 597, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).

### E.  The Lease for 102 W. Chicago

The shareholders, but not FSC, own 102 W. Chicago, which is the land on which FSC operates.  Across the street at 101 & 109 W. Chicago is the service portion of the FSC, which is owned by another affiliate of the Debtor, D.A. Fuller Family Partnership (D.A. Fuller), and beneficially owned by the Debtor's six shareholders.

The rent on 102 W. Chicago is $6,000 per month, which was memoraliazed in an agreement signed November 1, 2023. (Debtor's Ex. 22 at Dkt. 194).  Mr. Fuller signed the lease for 102 W. Chicago on behalf of both the landlord and the lessee. (Richards' Ex. 9 at Dkt. 197).  On the Debtor's Financial Affairs of the Debtor and Affiliates for 2023, FSC received $72,000 in rent/operating lease expenses memorialized in the Commercial Lease By and Between 102 W. Chicago and Fuller's Service Center. (Debtor's Ex. 22 at Dkt. 194).  At trial, Mr. Fuller said that FSC "must have" been paying 102 W. Chicago $6,000 in rent prior to the execution of the November agreement.  The Debtor had a lease in place from May 17, 2010 until May 30, 2020 under which the Debtor paid 102 W. Chicago $17,000 per month. (Debtor's Ex. 21 at Dkt. 194).  Mr. Fuller testified that the rent was lowered from $17,000 "to help the Fuller's Service Center have better cash flow." Transcript of Record at 350, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).

The loan to 102 W. Chicago was one of the intercompany loans removed from the Debtor's Balance Sheet. Mrs. Headley stated that "this entry was made when the 102 W. Chicago Heartland loan that Fuller's Service Center got. [Mr. Welch] is thinking that this is an actual debt that needs to be repaid by 102 W. Chicago." (UST's Ex. 41 at Dkt. 193)

D.A. Fuller previously leased the 101 and 109 W. Chicago property to the Debtor for $65,000 per month. (Debtor's Ex. 23 at Dkt. 194). This lease expired on December 31, 2020, but the Debtor continued to occupy the premise although it had stopped paying rent in 2014. Transcript of Record at 353, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246). On January 1, 2025, the Debtor entered a new lease with D.A. Fuller under which D.A. Fuller agreed to waive the back rent owed since 2014. (Debtor's Ex. 24 at Dkt. 192). In an email to Ms. Thalmann, Mrs. Headley said, "For the lawsuit we needed to create a new lease between [D.A. Fuller Family] and Fuller's Service Center for all the parcels occupied by Fuller's Service Center's buildings except the car wash." (UST Ex. 23 at Dkt. 194). The rent at 101 and 109 W. Chicago is now just $6,000. *Id*. Mr. Fuller testified that the rent was reduced from $65,000 to $6,000 "so that the company can afford to pay it." Transcript of Record at 357, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).

### F. Misappropriation of Proceeds from the SBA Loan

In 2022, the Debtor obtain a loan from the Small Business Administration (SBA). Although, the SBA funds, totaling $1.9 million, were to be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic, they were not. (Richards' Ex. 8 at Dkt. 197). Mrs. Headley stated that "when the debtor received the SBA funds, they used those funds to pay off" a mortgage to Heartland Bank for 102 W. Chicago. Transcript of Record at 118,

*In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).  The mortgage amount was $1.3 million and the remaining $600,000 "was for loans for the debtor in Heartland." *Id*. at 188.

At her deposition, Mrs. Headley stated, "When we received SBA funds, this amount was paid back to Susie for her purchasing their mom's house." Transcript of Record at 196, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).  Mrs. Headley stated at trial that she was mistaken during her deposition.  She "went back and reviewed, and the loan proceeds went to pay the four Heartland loans for Service Center and the 102 West Chicago loan." *Id*. at 197.[12]  Mr. Fuller justified this treatment as helpful for FSC because while it was not obligated to pay 102 W. Chicago's mortgage debt, it had guaranteed the mortgage. Transcript of Record at 576-77, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).  Mrs. Headley also stated that paying off its debt to Heartland allowed FSC to get a $500,000 Line of Credit, which increased FSC's cash flow. *Id*. at 624.

Some of the SBA loan proceeds also went to pay off an equipment financing facility to Heartland Bank totaling $520,000. Transcript of Record at 585, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).  A total of $50,000 from the SBA loan went into FSC's checking account. *Id*.  The difference between the equipment financing facility ($520,000) and the amount owed to Mrs. Groenewold ($571,000) is approximately $50,000. *Id*.

FSC did not disclose to the SBA that they used the SBA loan to pay off the $1.3 million mortgage on 102 W. Chicago from Heartland Bank and did not disclose that they would use the

---

[12] This is one more instance of confusion as to what funds were used for.  This is almost the exact amount loaned to Susan Groenewold. (Debtor's Ex. 31 at Dkt. 194).  However, in an email to Mr. Phillips dated January 3, 2025, Mrs. Headley stated, "Due from Groenewold – when we received SBA funds, this amount was paid back to Susie for her purchasing their mom's house.  It was meant to be repaid when Liz died from her insurance proceeds." (Richards' Ex. 36 at Dkt. 198).

proceeds to pay down the indebtedness of another entity. *Id*. at 283-84.  Under the terms of the SBA loan, 102 W. Chicago was not a borrower of any of the funds.  Despite this, Mr. Fuller testified that he believed paying the mortgage for a different non-borrower entity was proper use of the loan because "the lower interest rate . . . was helping Fuller's Service Center have less of a monthly payment." Transcript of Record at 298, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).  Mr. Fuller also stated that the Heartland Bank loan had a 6% interest rate while the SBA loan was only 3.25%. Transcript of Record at 575-77, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).  Mrs. Headley testified that the remaining loan money went into the Debtor's checking account and was used for general cash flow purposes, but could not be certain that it did not go to the shareholders. *Id.* at 582-83.

The terms of the SBA loan also did not allow the borrower to "make any distributions of assets, or give any preferential treatment, make any advance . . . by way of loan, gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlling or affiliated with or controlled by the Borrower." (Richards' Ex. 8 at Dkt. 197).  Despite this language, Mr. Fuller admitted that FSC was paying distributions to him and the other shareholders during the term of the loan. Transcript of Record at 300-01*, In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).

Mr. Fuller testified that the land the Debtor sits on is worth $5 million to $9 million, but believes "it's worth around $15 million." *Id*. at 285.  Mr. Fuller also admitted that he has "no intention of selling any portion of the business or the land to pay creditors." *Id*. at 285-86. *See also Id.* at 315.  The Debtor's Amended Plan shows that the Debtor will repay the secured portion of the SBA loan, approximately $230,000, while the remaining $1.9 million unsecured portion will be

repaid by 102 W. Chicago, LLC. (Dkt. 180).  102 W. Chicago's only asset is the land it sits on, which the Debtor pays $6,000 per month to occupy.

### G. The Sale of Four Car Wash Entities

Fuller's Cicero, Fuller's Elgin, Fuller's Matteson, and Fuller's Calumet City were car washes owned by the Fuller Family and several owed funds to the Debtor.[13]  All four were sold to Sparkle Car Wash in March of 2024, but the Fuller Family still owns the real estate on which Sparkle Car Wash operates and pays rent to Fuller's Cicero. Transcript of Record at 339-40, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246); *see also* Transcript of Record at 567-68, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).  In an email to Mr. Phillips, Mrs. Headley stated that the car washes sold "had balances owed to Service Center." (UST's Ex. 29 at Dkt. 193).  In spite of the outstanding amounts owed to the Debtor, the money received from the sales went to the shareholders rather than repaying FSC. Transcript of Record at 129, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).

Mr. Fuller testified that Munn Holdings was set up to receive the proceeds from the sale of four car washes. Transcript of Record at 401, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).  The members of Munn Holdings are "[t]he same six shareholders as the debtor." Transcript of Record at 114, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245).  On August 24, 2023, Mrs. Headley emailed Mr. Phillips asking for his advice on how to invest the proceeds of the sale from the car washes.  "[W]ith [the Richards'] . . . lawsuit looming over Service

---

[13] It was not clear how much was owed, but it was clear that any amounts owed were not paid to FSC at the time of the sales and any amounts received were put into Munn Holdings to protect these funds from creditors, including the Richards Family.

Center," Mrs. Headley's objective was "to make sure that the car wash proceeds are protected from any liability beyond what the insurance policy will pay out." (UST's Ex. 20 at Dkt. 192). This email was sent one month after the accident that killed Sean Richards. Transcript of Record at 112, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 245). In another email to Mr. Phillips, Mrs. Headley made it clear that her goal in setting up a separate LLC for the proceeds of the car washes was "to protect the money from the current lawsuit." (UST's Ex. 21 at Dkt. 192). Mrs. Headley eventually testified that the money held by Munn Holdings was used to pay down the SBA loan, pay off real estate taxes, a broker fee, and attorney's fee, $2.3 million was set aside for taxes, and the six shareholders got $500,000 each. Transcript of Record at 569-70, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248).

### H. Doug Fuller and Susan Groenewold Receive Salary Increases Instead of Future Distributions

Mr. Fuller and Mrs. Groenewold both received salary increases prior to the bankruptcy filing. In December of 2024, Mr. Fuller and Mrs. Groenewold made $5,500 per pay period, but in January of 2025, the month the Debtor filed bankruptcy, both made close to $9,000. Transcript of Record at 255, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246). Mr. Fuller explained the increased salary was to compensate them as they would no longer receive dividends but "we were doing a lot more work, me and my sister. We had a lawsuit, and we had to adjust our salaries compared to what other ones were making." *Id*. at 255-56.

Both Mrs. Groenewold and Mr. Fuller received a salary of $232,000 in 2025. Transcript of Record at 526, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248). This is apparently less than they received in 2024, which was $302,000. (Debtor's Ex. 34 at Dkt. 194). Mrs. Headley attributed the salary change to an increase in cash flow because the shareholders

were no longer receiving $72,000 in distributions, Ethan Fuller had retired, and Adam Fuller was terminated. Transcript of Record at 538, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 248). Additionally, in 2024, despite neither of them working for the Debtor, FSC paid Paula Fuller and Colin Fuller a salary beginning at the end of March and continuing for nine pay periods. (Richards' Ex. 16 at Dkt. 197).

## III.

### The Appointment of a Chapter 11 Trustee is Required in this Case

The Debtor has demonstrated that through gross mismanagement, self-dealing and general incompetence that the appointment of a chapter 11 trustee is proper. The Debtor has continually breached its fiduciary duty owed to creditors which is a fundamental principle of the Bankruptcy Code.

### Gross Mismanagement

Simple mismanagement is not enough to appoint a Trustee because "one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek Chapter 11 relief." *In re 4 C Sols., Inc.*, 289 B.R. 354, 370 (Bankr. C.D. Ill. 2003). A court "must find something more aggravated than simple mismanagement in order to appoint a trustee." *Id.*; and see *In re LHC, LLC*, 497 B.R. at 309; *In re Waterworks, Inc.*, 538 B.R. 445, 465 (Bankr. N.D. Ill. 2015). In considering whether cause exists, a court must focus on the debtor's current management, not its past management. A trustee is not warranted if current management is "free from the previous management's taint." *In re Woodlawn Cmty. Dev. Corp.*, 613 B.R. at 684. But where past management is also current management, confidence in whether a "new leaf" has been turned is important. This court finds that Mr. Fuller and the other shareholders have engaged in

25

gross mismanagement, beginning well before the petition date and continuing post-petition, sufficient to warrant appointing a chapter 11 trustee.

As the president of the Debtor and all affiliates, Mr. Fuller is responsible for properly managing FSC, including its financials. While Mr. Fuller hires people more knowledgeable about financials than himself, it is still his responsibility to understand the Debtor's financial operations. It is clear that Mr. Fuller does not or is simply not interested in doing that and seemed quite comfortable with blaiming others for "mistakes." He admitted to having almost no involvement in preparing for the bankruptcy filing. Although he signed all bankruptcy related filings under penalty of perjury and was the responsible party, Mr. Fuller said that he had never read the documents before.

Additionally, Mr. Fuller's admission that he knew nothing about the removal of intercompany loans and due to shareholders is troubling at best and incredible at worst. During the trial, Mr. Fuller took no responsibility for the mismanagement of the Debtor pre and post-petition, saying he "had nothing to do with" removing the intercompany loans and due to shareholders. According to his own testimony, Mr. Fuller has turned a blind eye to the mismanagement of FSC, is willfully ignorant about the way FSC has been mismanaged, and does not seem to care about accurately reporting FSC's financial situation. "Schedules and statements of financial affairs are sworn statements, signed by debtors under penalty of perjury. Adopting a cavalier attitude toward the accuracy of the schedules and expecting the court and creditors to ferret out the truth is not acceptable conduct by debtors or their counsel." *In re Jakovljevic-Ostojic*, 517 B.R. 119, 127 (Bankr. N.D. Ill. 2014) (citing *In re Duplante*, 215 B.R. 444, 447 n. 8 (9th Cir. BAP 1997).

Mr. Fuller and FSC management also intentionally hid assets from creditors when it removed the intercompany loans and due from shareholders from its financial reports and when it hid the proceeds of the sale of several car washes.  Accurate financial reporting "is material to the [bankruptcy] estate." *In re Gauri*, 663 B.R. 88, 101 (Bankr. N.D. Ill. 2024).  "Courts have found that a Chapter 11 trustee should be appointed when there is either a perceived dishonesty or withholding of information or a debtor's inability to provide accurate records and reports." *In re Peak Serum, Inc.*, 623 B.R. 609, 620 (Bankr. D. Colo. 2020).  This is because "[o]pen, honest and straightforward disclosure to the Court and creditors is intrinsic to the entire reorganization process and begins on day one, with the filing of the Chapter 11 petition." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989).

Since before filing, the Debtor has endeavored to provide an incomplete picture of its finances while failing to give adequate explanations for the numerous inconsistencies in their financial reports.  The timeline is confusing, but from the records and testimony, it is clear that  the Debtor removed intercompany loans and due from shareholders on the eve of filing.  It continued to manipulate these assets on the FSC balance sheets again in April of 2025, and only reinstated intercompany loans and due from shareholders following pressure from the UST.  Further, it took until September of 2025 for the Debtor to file what it reports are accurate schedules, and it did so only after it had been caught hiding these items at the 341 meeting and after the UST pressed for information about their removal. (Dkt. 219).  FSC management also set up Munn Holdings, LLC with the intent to hide the proceeds from the sale of four car washes following the accident.  Although there were amounts owed by the car wash entitites to FSC, these amounts were not repaid and the sale proceeds were placed in Munn Holdings.  Emails from Mrs. Headley paint a clear

27

picture about why Munn Holdings was created; twice Mrs. Headley stated that it was established specifically to protect the proceeds of the sale of the car washes from the pending lawsuits.

The integrity of the bankruptcy process rests on debtors telling the truth.  "Inherent in any fiduciary's obligations is the duty to tell the truth.  Where a debtor fails to disclose material information to the Court and to creditors, the appointment of a chapter 11 trustee is appropriate." *In re Sanders*, No. 99 B 9876, 2000 WL 329574, at *4 (Bankr. N.D. Ill. Mar. 2, 2000).  The UST and counsel for the Richards provided ample evidence that FSC management has not disclosed material information and in fact endeavored to hide the nature of its intercompany transactions and manipulations between debtor and shareholders.  Mrs. Headley and Mr. Phillips both admitted to removing the items and  removal is apparent from the Debtor's balance sheets, financial disclosure statements, tax returns, and emails.

Several times, the explanation for the due from shareholders and due from related entities removal was because these items were not generating cash flow.  In many ways, this is absolutely true, the Debtor, its related entities, and its shareholders and other family members never planned on repaying any of these amounts.  The Bankruptcy Code and the Federal Rules of Bankruptcy Procedure require full disclosure, and this transparency is the foundation of chapter 11 bankruptcy. Debtors who fail to provide accurate and transparent disclosure do not merit the privilege of continuing as debtors in possession.

Mr. Fuller repeatedly blamed Mrs. Headley for the fact that these obligations of the Debtor or its affiliates were not disclosed.  And while Mrs. Headley, an experienced bookkeeper, was primarily responsible for preparing the Debtor for bankruptcy, Mr. Fuller signed and affirmed the many misleading and false disclosures under penalty of perjury.

28

This court has no confidence that the Debtor is the least interested in collecting amounts due from its shareholders, family members, or related entities to fund its chapter 11 plan of reorganization. The lack of trust and confidence in FSC leadership is fundamental to this court's belief that the appointment of a chapter 11 trustee is required. The exploration of whether additional assets are hidden is essential to benefit creditors. The testimony revealed numerous transactions favoring related entities, including but not limited to, the use of the SBA loan proceeds, the sale of the related carwash entities that owed FSC money, the purchase of Christmas trees for FH&H, the purchase of various luxury vehicles, and the personal use of the Debtor's credit card by shareholders.

**Self-Dealing**

The Debtor engaged in self-dealing when Mr. Fuller and Mrs. Groenewold gave themselves a salary increase in lieu of distributions and when it misappropriated the proceeds of the SBA loan for the benefit of affiliate organizations. A Chapter 11 Debtor owes a fiduciary duty to its creditors. 11 U.S.C.A. § 1107(a); *Wolf v. Weinstein*, 372 U.S. 633, 650, 83 S. Ct. 969, 979, 10 L. Ed. 2d 33 (1963); *In re Schipper*, 933 F.2d 513, 516 (7th Cir. 1991). "The duty of loyalty includes the duty not to engage in self-dealing," meaning the debtor-in-possession, "is proscribed from acting solely in its self-interest to the exclusion of the other interests which the debtor-in-possession has the fiduciary obligation to protect." *In re Bellevue Place Assocs.*, 171 B.R. 615, 624 (Bankr. N.D. Ill. 1994). "Courts may find a conflict of interest, which can constitute cause for appointment of a trustee, where the debtor has inappropriate dealings with an entity in which the debtor has an interest." *In re Sillerman*, 605 B.R. 631, 646 (Bankr. S.D.N.Y. 2019).

Mr. Fuller and Mrs. Headley admitted to using the SBA proceeds to pay down the debt of an affiliate entity. $1.3 million went to pay off the mortgage at 102 W. Chicago and the remaining

29

$600,000 went to other loans owed to Heartland Bank.  Mrs. Headley stated in an email and at her deposition that the $600,000 was paid to Mrs. Groenewold, then said this was not the case at trial. This court does not find Mrs. Headley credible as to the explanation of this and many other transactions.  Both she and Mr. Fuller were intent on hiding transactions which benefited the Debtor, its affiliates, and shareholders and much too often explained these as "mistakes."

Whether $600,000 went to Mrs. Groenewold or to Heartland, the Debtor still misappropriated the SBA proceeds.  The terms of the SBA loan clearly stated that it was to be used as working capital, which Mr. Fuller stated he understood to be "[w]hen you have money or you have assets you're able to work with." Transcript of Record at 283, *In Re Fuller's Service Center, Inc.*, 25-01345 (2025) (Dkt. 246).  FSC, not 102 W. Chicago, borrowed money from the SBA, and the proceeds were to be used for its working capital, not to assist with an affiliate entity's debt.

The Fuller Family and FSC shareholders continue to benefit themselves through the purchase of whole life insurance policies.  The shareholders converted term life insurance policies into whole life insurance policies at significant cost to the Debtor.  This removed additional cash from FSC's assets soley for the benefit of its shareholders.  Finally, the purchase of luxury cars for shareholders, employees, and non-employess was a further instance of removing cash from FSC or FH&H's balance sheet for the benefit of the shareholders and the Fuller Family.

FSC's management has a material conflict of interest.  It has taken no action to collect on debts owed by its shareholders, employees, or Elizabeth Fuller.  Thousands are owed by shareholders and employees through their free use of company credit cards.  The Debtor is almost a year into its bankruptcy and has yet to take any meaningful steps to collect the debt it is owed. Cause exists to appoint a Chapter 11 trustee where a debtor fails to fulfill its fiduciary duty by not pursuing causes of action beneficial to the estate.

**Conclusion**

The evidence is plentiful to support the appointment of a chapter 11 trustee. The fumbling and yet consistent efforts to hide assets, refusal to avoid transfers, and otherwise refusal to act as a fidiuciary to its creditors mandates that this court direct the Office of the United States to appoint a chapter 11 trustee under section 1104(a) for incompetence and gross mismanagement of the affairs of the debtor by current management both before and after the commencement of this case. Moreover, the Debtor and its president have a significant conflict of interest in pursuing the collection of these assets and in proposing a plan which truly benefits all of its creditors.

The Debtor has offered to agree to the appointment of an examiner or other independent person to pursue avoidance of many of the transactions mentioned above. In this instance, this is too little and too late. Over the last year, the Debtor has demonstrated that while it operates through numerous entities, the operation is really only one large entity where the Fuller Family members benefit and have for many years. While, as some have suggested in this case, many closely held entities operate in this manner, when creditors and this court are not dealt with fairly, it is incumbent on this court to order the appointment of a trustee.

Dated:  12/9/2025

_____
Honorable Deborah L. Thorne
United States Bankruptcy Judge